# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 23, 2020

Lyle W. Cayce
Clerk

No. 18-40912

Fernando S. Narro,

*Plaintiff—Appellant*,

*versus*

E. Edwards, Officer; Sergeant Duminski; D. O. Mowry;
D. O. Killgore; D. O. Stanford; D. O. Gregory,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:16-CV-310

Before Dennis, Graves, and Willett, *Circuit Judges*.

Per Curiam:[*]

Mr. Fernando S. Narro, who is currently incarcerated in Texas and is proceeding *pro se*, filed this 42 U.S.C. § 1983 civil rights action against law enforcement officers Colton Edwards, Daniel Duminski, Darren Mowery,

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 18-40912

Sean Killgore, and Michael Gregory (collectively, "Defendant-Appellees").[1] Mr. Narro asserts that, while he was in pretrial detention at the Brazoria County Detention Center on September 26, 2016, these officers used excessive force against him in violation of his rights under the Eighth Amendment. The district court granted summary judgment in favor of Defendant-Appellees and dismissed Mr. Narro's claims with prejudice. We AFFIRM.

## I. FACTUAL OVERVIEW AND PROCEDURAL HISTORY

### A. Allegations and Affidavits

The parties' allegations regarding the events in question differ. They agree that at approximately 2:00 a.m. on September 26, 2016, Defendant Edwards told Mr. Narro that he had to move to another cell because the night light in his existing cell was not working. At the time, Mr. Narro was housed on "A-Row," which the officers allege "houses inmates who are segregated from the general population due to disciplinary problems, mental health or medical issues, or other reasons." Defendant Edwards explained in an affidavit filed with the district court that he decided to move Mr. Narro because his cell was "completely dark" and because "a cell two or three doors down . . . had just come available." Mr. Narro refused.[2]

According to Mr. Narro, Defendant Duminski got upset and started yelling at him. Defendant Duminski entered the cell, and an officer

---

[1] Mr. Narro also named "D.O. Stanford" in his suit. The Brazoria County District Attorney's Office appeared on behalf of all defendants except Stanford and stated that "[t]he Brazoria County Sheriff's office . . . employed no detention officer with this name at the time of the alleged incident."

[2] Mr. Narro alleges that he refused the officers' verbal orders twice, but that he agreed to move after the third request. Defendant Edwards alleges that Mr. Narro refused him at least three times and subsequently refused Defendant Duminski.

No. 18-40912

"blindsided" Mr. Narro. Defendant Duminski then slammed Mr. Narro's head into the wall and against the railing of his bunk. Mr. Narro put his hands up by his head to protect himself, at which point Defendant-Appellees and an unknown officer allegedly started punching Mr. Narro in the face and head area. Mr. Narro maintains that he was still in bed, under the mattress cover, and not a threat. The officers then put restraints on Mr. Narro's wrists and moved him to what he describes as the "mental" cell, the officers term the "violent" cell, and we refer to as the "second" cell. Mr. Narro alleges that Defendant-Appellees continued to assault him until a nurse arrived.

According to the officers,[3] after Mr. Narro refused repeated requests to move, Defendant Edwards called for a supervisor. Defendant Mowery, Defendant Duminski, and Sergeant Stacy Holmes arrived to assist Defendant Edwards. When Defendant Duminski entered the cell, Defendant Edwards saw Mr. Narro "sit up quickly and square his body" toward Defendant Duminski. The officers allege that, after they repeatedly ordered Mr. Narro to turn around to be handcuffed, he refused to comply and raised clenched fists. When Defendant Edwards tried to grab Mr. Narro's right arm in order to handcuff him, Mr. Narro became violent and started thrashing and moving his arms and upper body and kicking his legs. Defendant Mowery averred that Mr. Narro's movements were aggressive and that he "looked like he was going to engage in an altercation." Defendant Duminski averred that Mr. Narro cursed and threatened the officers, sat up in the bed and tensed up, and raised his fists to his chest. Defendant Duminski then struck Mr. Narro once on the head with his fist. He alleges that he "did not intend to strike

---

[3] Two groups of officers filed motions for summary judgment. The affidavits filed by the first group, which comprised Defendants Duminski, Edwards, and Mowery, are described below. The summary judgment motion filed by Defendants Gregory and Killgore, meanwhile, argues that those officers did not participate in any use of force.

[Mr. Narro] in the head, but . . . reacted as quickly as possible to avoid being hit." After Mr. Narro was handcuffed, Defendant-Appellees allege, he was pulled to the ground because he continued to pull away, kick, and threaten the officers. Mr. Narro was then transferred to the second cell, but he continued to resist. Specifically, Defendants Edwards, Mowery, and Duminski allege, he kicked at the officers and hit Defendant Edwards in the face above his eye. Mr. Narro eventually calmed down, and a nurse bandaged his cut while the officers secured him. The officers removed the handcuffs and backed out of the cell. They allege that Mr. Narro got up during this process and moved toward the cell door in a threatening manner, but that the officers were able to close the door.

Mr. Narro's complaint was accompanied by an inmate grievance form that he filed regarding the incident. He later filed a statement by another inmate who overheard the use of force and Mr. Narro's protests.

### B. Photos and Videos

Defendant-Appellees filed video of the incident alongside their motions for summary judgment.

The first video, Exhibit 9F, was taken by a "Deputy Barrett," and begins sometime after Mr. Narro was handcuffed.[4] It reflects a struggle in the original, dark cell, in which Mr. Narro can be heard speaking belligerently and cursing. The officers are visible on the video working to remove the mattress cover that was wrapped around Mr. Narro's legs. They then pull Mr. Narro to his feet and escort him to the second cell. There, the video shows Mr. Narro continuing to thrash, kick, and speak belligerently as the

---

[4] In a use-of-force report filed by Defendant-Appellees, Deputy Barrett states that he "heard yelling on the front side of A-row," "grabbed the camera," and went to film the incident.

No. 18-40912

officers attempt to restrain him. Less than two minutes after Mr. Narro enters the second cell, the video shows a nurse arriving at the cell and treating him as several officers continue to restrain him. The officers, who state in their affidavits that they removed Mr. Narro's clothing, can be seen on the video explaining what they are doing and tossing the clothing out of the cell. They then remove Mr. Narro's handcuffs and back out of the cell, closing the door quickly behind them.

The second video, which has no audio, appears to have been taken from a security camera at the end of the hall in which Mr. Narro's cell was located. It shows officers arriving outside of Mr. Narro's cell and entering the cell. An officer, presumably Deputy Barrett, arrived outside of the cell and began to film approximately forty-seven seconds after officers entered the cell. Shortly thereafter, the video shows the officers walking Mr. Narro to the second cell.

Photos taken after the incident were also filed with the district court, although they are of low quality. They show the left side of Mr. Narro's face, his cell door, and blood within the cell.

### C. Procedural History

Mr. Narro filed suit. In addition to a small cut on his left temple, documented in the photos referenced above, he alleges injuries to his shoulder that require pain medication to the present time, a bruise near his pelvis, an abrasion on his forehead, and the swelling and bruising of both ears.[5] Defendant-Appellees filed a motion to dismiss and motions for

---

[5] Mr. Narro, who submitted to this court an audiology report documenting his loss of hearing, now argues that the officers' actions caused him to suffer possible permanent hearing loss. He did not make that allegation at the district court. This court may not consider new claims or new evidence presented for the first time on appeal, so we do not

summary judgment. As noted above, *see supra* note 3, the summary judgment motion filed by Defendants Duminski, Edwards, and Mowery directly refutes Mr. Narro's allegations and asserts qualified immunity. The motion filed by Defendants Gregory and Killgore, meanwhile, asserts that those officers did not participate in any use of force.

After reviewing those motions, the district court granted summary judgment in favor of Defendant-Appellees and dismissed Mr. Narro's claims with prejudice. In doing so, the court reasoned that Mr. Narro had "failed to demonstrate a genuine issue of material fact as to whether the force Defendants used against him was 'objectively unreasonable.'" This appeal followed.

## II. STANDARD OF REVIEW

We review "a grant of summary judgment de novo, applying the same standard as the district court." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017); *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Austin*, 864 F.3d at 328 (internal quotation marks and citation omitted). All facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009).

---

analyze that alleged injury. *See Burge v. St. Tammany Parish*, 336 F.3d 363, 372 (5th Cir. 2003); *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999).

Qualified immunity "shield[s] a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001). For an official's violative conduct to be objectively unreasonable, so as to preclude qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts need not consider the two-step analysis of qualified immunity claims in any particular order).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Once an officer invokes the defense, the plaintiff must rebut it by establishing (1) that the officer violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was "clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008) ("The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct.").

To prevail on his excessive force claim, Mr. Narro must therefore establish "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005). "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Courts analyze (1)

"the extent of [the] injury suffered," (2) "the need for [the] application of force," (3) "the relationship between that need and the amount of force used," (4) "the threat reasonably perceived by the responsible officials," and (5) "any efforts made to temper the severity of a forceful response." *Id.* (internal quotation marks and citation omitted); *see also Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998). "[A]ll inferences are drawn in [the plaintiff's] favor." *Brown*, 623 F.3d at 253. But "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (citation omitted); *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

## III. DISCUSSION

The parties dispute what took place on the relevant night, as described in detail above. Crucially, however, only Defendant-Appellees' version is supported by competent summary judgment evidence. Mr. Narro's version is supported by only two filings: his unverified complaint and an unsworn inmate grievance form.[6]

In general, parties may not rest on their own pleadings at the summary judgment stage. Instead, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477

---

[6] As noted above, Mr. Narro also submitted a statement by another inmate. That inmate averred that (1) the officers were going to move Mr. Narro because the night light was out; (2) the light had been out for a few days; and (3) he heard Mr. Narro say "I am not the one," that Mr. Narro wanted to stay in the cell in case he had a seizure, and that Mr. Narro said "y'all going to beat me up" while handcuffed. None of those statements support Mr. Narro's version of the events that transpired after he expressed disinterest in moving cells.

U.S. 317, 324 (1986) (quotation marks omitted); *see also Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) ("Conclusory allegations unsupported by specific facts . . . will not prevent an award of summary judgment; the plaintiff [can]not rest on his allegations . . . to get to a jury without any significant probative evidence tending to support the complaint.") (quotation marks and citation omitted). Because Mr. Narro did not submit a sworn affidavit or other competent evidence, the court cannot credit his version of events.

In contrast, Defendant-Appellees submitted several affidavits. According to that evidence, the officers were aware that Mr. Narro was "frequently housed in A-Row for disciplinary violations" and had previously "attempted to harm a jailer." Mr. Narro refused repeated instructions to move to another cell, resisted and threatened officers, kicked, swung his fists, and thrashed his body. When officers entered his cell, which was dark, Mr. Narro sat up in bed, tensed up, and raised his fists; Defendant Duminski reacted to avoid being hit and struck Mr. Narro once on the head. After he was handcuffed, Mr. Narro continued to pull away, kick, and threaten the officers. The officers therefore pulled him to the ground. After Mr. Narro was transferred to the second cell, he continued to resist and kicked the officers, and he hit Defendant Edwards in the face above the eye. A nurse bandaged a cut on Mr. Narro's forehead, and the officers removed his clothes and handcuffs. As the officers backed out of the cell, Mr. Narro got up and moved toward the cell door in a threatening manner. The officers were able to close the door, and the encounter concluded.

As noted above, the burden is on Mr. Narro to rebut the officers' invocation of qualified immunity by establishing (1) that the officers violated a federal statutory or constitutional right and (2) that the unlawfulness of their conduct was "clearly established at the time." *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citation omitted). Because Plaintiff failed to

submit any relevant and competent summary judgment evidence permitting us to draw inferences in his favor, he has not met that burden.[7]

Defendant Duminski's affidavit must be treated as evidence of his version of events (i.e., that he used a non-deadly punch to gain control of a resisting inmate and prevent his own assault). Although the officers could have used less forceful conduct, there was no settled authority to put them on notice that their use of force violated Mr. Narro's constitutional rights. *See Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) ("We must evaluate an officer's use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (internal quotation marks and citation omitted)); *see also Griggs v. Brewer*, 841 F.3d 308, 315 (5th Cir. 2016) (finding that an officer was entitled to qualified immunity as to claims that he punched an individual who was ignoring his commands until the officer could regain control of the individual's arms and handcuff him). We therefore agree with the district court that Mr. Narro has not met his burden to rebut the officers' invocation of qualified immunity.

AFFIRMED.

---

[7] We note also that "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Hanks*, 853 F.3d at 744. Mr. Narro's allegations regarding his demeanor are discredited by video, but no useful footage reflects the exact events leading to Defendant Duminski's striking Plaintiff. But because Plaintiff's version of events was not substantiated by competent summary judgment evidence, he cannot benefit from that lapse in footage.